Thank you gentlemen. Mr. Kelly, I assume you're going to want to reserve some time. Yes, your honor. All right. It's not often we get the attorneys who wrote the briefs to appear to argue. Generally, those who argue put their brief writers in the second chair. So we're excited. Yeah, right. Mr. Kelly. Thank you, your honor. May it please the Court. This is an appeal from a decision of the Board of Review of the State of Illinois Department of Employment Security, a decision by the Board to grant unemployment compensation to Lisa Lovich, the former women's softball coach at Concordia, which is a nonprofit university. This case revolves around a trip that the softball team took to Arizona. I don't want to hurry you, but we've all read the record and the briefs. Maybe we could start you on a question that might serve us all. If not, feel free to start from the point that you would prefer. There are eight different grounds here for claims here for the denial of misconduct that apparently would also support a denial of unemployment compensation. Is it fair to say that aside from the alleged misrepresentation with regard to the car rental and perhaps, although I would probably group this next one with the other six, the rental of the Hummer itself, substantively, that the other six, although they would perhaps satisfy the definition of misconduct, were that to be determined as the fact that those are subject to the manifest weight of the evidence standard and probably would not be worthwhile pursuing on appeal because there at least was some evidence to support the finding of the board with respect to them. Would that be a fair statement? No, Your Honor, I don't believe it would. Okay, then be my guest. And the reason it wouldn't is because we were prevented from presenting the testimony of whoever. However, okay, I understand that. You claim to have had the testimony, for example, of Campbell. Correct. To support the charge that there was some possible inappropriate contact between the claimant and one of the players, Anderson. Correct. Okay. But even so, even there, with regard to that, there was the testimony of Anderson, that there was no inappropriate conduct so that, but for the exclusion of the finding, would have at least had some support and some evidence. In other words, if there was a decision that there was, that those were the facts, it wouldn't be against the manifest weight of the evidence having had some evidence provided. Your Honor, I think our biggest problem with the decision is the fact that you can't even get to a manifest weight standard of review because the evidence that we intended to support our position wasn't even put in the record. If we were dealing with a situation. That's a fair statement. If we were dealing with a situation where all the evidence was in and it was simply who's right and who's wrong, I totally agree that it's a manifest weight. It's a very different standard. No. If your witnesses were allowed to testify and the board still ruled as it did, the ruling would not have been against the manifest weight of the evidence because they had some support in the testimony. But otherwise, since they didn't allow the evidence, I suppose the standard would be harmless error. If it met the criteria for harmless error, which obviously you will say it didn't because for harmless error, you need something like overwhelming evidence or something along the Pedrick line or whatever, you know. Your Honor, I understand. And that's essentially the crux of our point here is we weren't able to establish the record that we needed to. And we're effectively, I would characterize it as whipsawed by the board because the board said, look, all you have is hearsay evidence. All you have is the decision maker stating I was told by parent A, I was told by player B. That's all hearsay. Okay. You're going back now to the issue of the misrepresentation. I can. Well, wherever you want to start, but I didn't want to, with my question, to necessarily fragmentize your argument from where it would have otherwise been, which I'm sure would have been very skillfully organized. Well, Your Honor, I will go back to the first issue, which is essentially the lie regarding the Hummer vehicle. And if I may just explain a little bit of the facts behind that. Well, let me break into that, too, if I can. With regard to the lie, there are several aspects, layers to it. First is whether there in fact was an untruth, a misrepresentation, I suppose deliberately given to the Concordia personnel, would it be Gebhardt or Nann? Gannan. Gannan. As to when the Hummer was selected and under what circumstance. Okay, was the selection made three months earlier when the trip was being organized by the claimant, or was it determined by what was actually available at the time? Okay. The trip, when it was organized, there was a statement quoted that the choice of the Hummer was attributable. I'm being very careful here because there is an explanation that tries to soften the statements or spin the statements in certain directions, and I don't want to interfere with that. But that the choice was determined by what was available at the time that the claimant reached the counter of the rental agents. Okay. Let's give that your spin. That she would have said that that was the only vehicle available, as opposed to the spin, which is that was the only suitable vehicle that was available. If, in fact, the Hummer was not more expensive, and if, in fact, the rental of the Hummer was not subject to an admonition, and was not in and of itself an element of misconduct. In other words, there was nothing wrong, per se, with renting the Hummer, okay? And a matter for which at least the manifest way that the evidence standard would support, if not categorically support. Would the lie, given its worst spin, your spin, be material? And if it's not material, would it be dispositive? Your Honor, I think the lie is dispositive, standing alone, which is why we've made it a focal point of our argument here. We don't feel employers in this State should have to tolerate dishonest employees. Well, what constitutes a dishonest employee? Supposing the employee would lie about something, about her briefcase being purchased at a sale, when, in fact, it was purchased at a higher price. I think dishonesty is something that's pertinent to the employment relationship. Any kind of dishonesty. Any kind of dishonesty. Because an employer has a right to expect that employees will be honest and truthful in all matters related to their employment. Mr. Kelly, can we take a step back? The concept that this is a lie seems to me to be premised on the comparison of two statements and the conclusion that both of those statements cannot be true. Is that fair? You're referring to the statement of it was the only available vehicle versus I rented it three months prior? Right. Correct, Your Honor. But as the State points out in its brief, that depends on the interpretation, or as Justice Gordon was referring to, alluding to, the spin on which you put those statements. In other words, it's not the same as the light was green, the light was red. There is room for at least some interpretation of what was meant by the words in this record. Isn't that fair? I think it's important to look at the context of the question that Ms. Lovitch received from Athletic Director Van Am. He's concerned about why did you rent an expensive vehicle? He doesn't care if it's an expensive Escalade versus a Hummer. He just wants an explanation of why did you rent an expensive vehicle. And in response to that, it's apparent to us from the evidence that she is trying to cover up her conscious decision. She's saying, look, I didn't have a choice in the matter because when I got to the counter, in fact the word counter is used, that was the only available vehicle. But isn't it possible, as the state suggests, that within the context of acceptable vehicles that would transport the equipment and people necessary, which might be SUVs or large SUVs or vans, that that was the only such vehicle available at the time you got to the counter? Isn't that what they're suggesting? And is there something in the statements or even adding in the context that you're arguing that would make that impossible? I think the state is making a stretch by implying that that's what she meant. Because I think the record... But you're implying what she meant. Well, I think there's a context behind it. But I think if you look at the issue of what she actually said, the words that came out of her mouth, and, of course, we take issue with the fact that the board just flat-out disregarded all of that. They considered everything that we had put in with respect to the lie to be hearsay. They didn't consider the fact that we had the testimony of Pete Ginnan, who said... I don't think there's much viability. I don't mind saying that in advance, and if the state wants to educate me to the contrary, fine. I don't think there's much doubt here that to the extent that we're dealing with a witness's reportage of the claimant's words, that we're not dealing with hearsay, even if we didn't have the direct testimony of the claimant itself. And if that's what the board meant, the board was wrong on the rules of evidence. That doesn't mean that if they get a bad mark of C in evidence, that they're going to flunk their bar exam. But there was no hearsay with regard to what the claimant said to an in-court witness, aside from the fact that you have the independent testimony of the claimant herself being interrogated in front of the hearing officer and virtually duplicating at least a good part of that statement. So, but unless the state wants to make an issue of it, which I will fully understand, I don't think we have to spend time on that. And, Your Honor, given that, in regards to that, because the board disregarded our evidence improperly, the manifest way to the evidence standard would not apply to that. What happens to the rule that applies at least with regard to lower courts that if the opinion, that if the decision of the lower court can be sustained on grounds other than that which the lower court itself relied, that we can do it as a reviewing court? I would grant that, Your Honor. I'm just simply pointing out that the... So there are other arguments here to consider, aside from the issue of whether it was hearsay. Correct, Your Honor. And I think the issue to consider, again, outside of the manifest way to the evidence standard, would be, did she in fact lie? And given the testimony of Ginnan about the fact that she told him it was the only available vehicle, she never said it was the only available special SUV, she said it was the only available vehicle. How do we know that's not true? Do you have any evidence in the record that that statement is untrue? The fact that there were other vehicles present at the car? Yeah. We don't have that, Your Honor. But I think the purpose of that in our mind is the idea that she was using that statement to deflect the causation here. Why did you rent this vehicle? I didn't have a choice. It was the only one available. When she made a conscious decision several months prior to the trip to rent that expensive vehicle. But where in the record is the comparative expense? Your Honor, that's part of what there are documents in the record that reflect information that Concordia obtained. Well, the state charges you, if you want to call it that, if you want to give it that serious label, with looking outside of the record. When the assertion by the state is made that this was more expensive. Well, Your Honor, I don't think for purposes of proving it. In point of fact, there is evidence in the record that it was less expensive in comparison with the other one. And, Your Honor, I mean, one thing was the large van that they had was for the team. They didn't necessarily need a large van for a handful of people. They needed folded down chairs. But from our standpoint, to prove the lie, it doesn't matter what the relative expense was of the various vehicles. She was asked the question, why did you rent this vehicle, and gave an untruthful answer. But the university didn't have to pay for this anyway. Is that right? Well, there was fundraising for the. For the income from university funds. Unfortunately, Your Honor, the record isn't developed enough for me to stand here and say which. Obviously, the university is footing the bill. There may have been some contribution. I thought it was they were paying for the transportation and housing of the athletes and staff. I think that's right. Unfortunately, I don't think the record is developed enough to say exactly how much money was allocated by the fundraising to this particular vehicle. But, again, it's our view that the underlying issue, which vehicle was more expensive and so forth, doesn't affect the question of whether or not she lied about the vehicle. Can we move on to the inability to preserve or to make a further record with these other witnesses and your arguments related to that? Or if there's something else you'd like to say about this issue, we'd be happy to hear it. No, Your Honor. I think that suffices. With regard to the other four witnesses who were excluded, there's a couple issues here. First of all, the referee never came up and said at the beginning of the hearing, look, you've got X amount of hours or there's certain restrictions. However, the reg, I guess what was it, 225, does say you have to bring your witnesses with you at the hearing. Ordinarily, wouldn't that mean when the hearing starts you have your witnesses there so that the court isn't, or that the board isn't left up in the air from day to day not knowing what's ahead? Your Honor, I agree with you in the sense that if we were asking for a continuance because we weren't prepared for the hearing, I would agree that we would be on the losing end of that argument. However, there was a fortuitous circumstance, to put it bluntly, that the referee couldn't continue the hearing on day one. And because of the fact that there were hearsay objections to the testimony of the decision maker about what he was told, the decision was made, let's bring the live witnesses who had firsthand knowledge of what happened on that trip who could put that non-hearsay evidence in the record. Their appearance was obtained voluntarily. They didn't have to be subpoenaed. They were all present and willing to testify. Their testimony wouldn't have been cumulative. In fact, it would have cured the very hearsay issue that... Why did the hearing continue? For that purpose, it wasn't continued because of the convenience factor regarding the referee running out of time. Because of the convenience factor of the referee hearing. And so the referee skipped it for another hearing with the referee having in mind how much time was going to be required based on the witnesses you brought to the first hearing. I don't believe there's anything in the record establishing the amount of time that was going to be spent on day two. Well, certainly the referee knew how many witnesses you had brought to the hearing. And therefore, if you have 20 people in the hallway, the referee would know that, well, I can't do this day. You've got 20 witnesses. But rather, they saw you had what? Three. Three. And so the referee said, well, I'm going to put it on a day when I can hear three. Well, again, I don't believe there was any issue on day two with the referee not having sufficient time. It's our view as an arbitrary decision to say, look, pick two. We had six. Pick two. You only get two. And, in fact, the referee stated, this is cumulative. I don't want to hear this anymore. It's covering the same ground. That was the rationale given by the referee for the exclusion. What about the lack of what could be termed as a detailed offer of proof? Well, in that issue, Your Honor, there's a couple things. First of all, if you look at the record, it's very clear that the referee was dismissive of that. In fact, there was an offer of proof with respect to player Courtney Campbell. In fact, she was going to testify, and I think it's on page 205 of the record. She was going to testify about the issue on the couch, and she was also going to testify about how she was personally interrogated by Ms. Lovich. Now, those were two of the eight reasons given for the termination. And the referee sort of summarily said, in fact, counsel for Concordia had wanted to go in. In fact, it's clear it was going to next explain Michelle Sarris, another player, what she was intending to say. And the referee said, look, I don't want to hear it. Let's move on. I guess my question is, and most lawyers have been in this situation. I know when I was practicing, it happened to me where the judge presiding or, in this case, a referee might be behaving in a way that the lawyer might interpret as being impatient. Hopefully you're not getting that today, because we're not. But the job of the lawyer in that circumstance is to protect the record and say, I'd like to make an offer of proof as to what these witnesses would say so that it could be preserved for reviewing courts or panels to say, well, this would have been useful. This might have made a difference. And there doesn't seem to be any statement directly to that that I can recall where the lawyer stands up to the hearing officer, referee, and says, no, I'd like to make an offer of proof as to what each of these witnesses would say so that we can preserve that issue. Your Honor, just two things on that. Number one, there was on page 306 of the record a formal objection stated at the end of the hearing about the fact that these witnesses were not allowed to testify. But secondly, I mentioned there was an offer. Are you sure that was 306? 306, Your Honor. We've got four witnesses. Courtney Campbell, there was an offer. There was a statement about what she would testify to. I would submit that the other three witnesses, even though there wasn't a formal offer made, the subject of their testimony was self-evident from the hearing, and I'll explain. The other witnesses were Michelle Sarris. She was the individual who there was a... An additional, she joined later in. Right, and there was the problem with her was the fact that she was left at the airport without supervision and there was transportation issues with getting her home and so forth. That's one of the eight reasons for the termination. Clearly, she's going to talk about her own personal knowledge of that situation. The other two witnesses are player Colleen Mulaney and her mother, who was actually present on the trip as well. This is the one who either was desperately ill or the one who won to the Cub game, won under the circumstances. And if you'd gone to the Cub game, it might have made you desperately ill for that matter. Those are the correct ones. But they clearly would have testified about that particular situation. So I don't think this is a question where there's any doubt in anyone's mind about the subject matter that the testimony of these witnesses would be directed to. So I would submit that the failure of a formal offer really doesn't affect the outcome here because I think it's obvious what these individuals would have spoken to. Again, we're dealing with a situation where the board said, well, all you have is hearsay, and we had an opportunity. The witnesses were present that day to correct that very situation, put in the live testimony to deal with that issue, and we were prevented from doing so. Did the board say that the proof of the other charges aside from those relating to the Hummer was also hearsay, or was the statement by the board or the finding by the board that there was hearsay connected only with the Hummer? Your Honor, the board's view in our recollection was that all of these other reasons, because of the fact that we had not put forward non-hearsay evidence, that there wasn't sufficient evidence in the record. In fact, if you look at its record, page 371, it's the third page of the board's decision, where in the second paragraph the board is in essence summarizing everything. It says, based on the evidence, we find that the employer has failed to provide sufficient evidence to meet the burden of proof necessary. The employer's proof is based on hearsay evidence, which was objected to by claimant's counsel. And it's our view that they're speaking to, in essence, the entire presentation that Concordia had, that everything that we put forward, with rare exception, was the testimony of the actual decision maker as to what he was told by the various players and parents who had made complaints here. Well, I'm sorry, because your briefs and what I saw in the appendix seem to use the term hearsay in connection with the Hummer. I'm looking particularly at 810 of the fourth paragraph on the appendix, page 10. Right. And they specifically did use the hearsay issue with Hummer as well, but they, in our view, took that position with respect to everything. Well, where is it? You just pointed that out in the record? Correct, Your Honor. It's the second paragraph on that same page, 810, at the top of the third page of the second sentence, where they're summarizing everything. They're saying the employer's proof is based on hearsay evidence, which was objected to by claimant's counsel. I just don't see the word hearsay used there, but it might be. Here. Your Honor, I mean, fundamentally, and just to conclude my presentation here on this issue, we had a situation here where there were a number of reasons for the termination. And because of that, it required sufficient time to develop the evidence and put that into the record. It's sort of a paradox. I mean, the more reasons you have behind a decision, the more time you need to put that in. It's not something that can be done in a 20-minute hearing. And so based on the Board's decision to exclude these witnesses, we were prevented from. All right. Well, let me ask you one other question. It's sort of a bit argumentative. I'm not asking you to betray your client with any answer. But conceivably, if you haven't attacked the hearsay finding of the Board for anything other than that related to the Hummer. Correct. Where they mistook an admission by a party, well, by definition, that's what an admission is, as hearsay. So one would think that the other evidence by which you chose to establish at least some of the other grievances were, in fact, hearsay. The good lawyer that you are, shouldn't that have caused you to anticipate the need for other witnesses from the get-go rather than on the spur of the moment? Your Honor, I know there's not – I don't want to speak off the record, so to speak. I can give you an answer to your question. It's not based on the record. I don't know if you want to hear that. No. I want to hear it, but I think we choose not to. Well, we appreciate your preface. If there are no further questions, that concludes my presentation, save for rebuttal. Thank you, Mr. Kelly. Mr. Siegel. Good morning again, Your Honors. I want to jump right into the question of the lie, the alleged lie, but before I do that, I wanted to clarify the standard of review. I think there's no dispute at this point that we're on de novo review. We're on very deferential standard of review manifest weight on the question of the Hummer H-3. But it's our contention that on the question about whether the hearing referee should have prevented Concordia from presenting brand-new witnesses on day two of the hearing, the standard of review is abuse of discretion, also very, very deferential. And on the lie issue, I think I could cut right to the chase and maybe clarify what we've been discussing this morning. There's no reason to look at this issue as one of spin or as opposing counsel referred to it earlier as implying counsel. That may be true or may be more spit. Let me point you to something in the record. Let me back up and say that the premise of the theory that Ms. Lovitch lied is based on one of two ideas. Either she didn't prearrange the rental of the car, or secondly, she did prearrange the rental of the car, but this was such an unusual practice planning in advance for a team of 14 people that failing to disclose it, failing it to mention when she was being interrogated to Mr. Canan and Ms. Gephardt was, in essence, a lie of omission. Now, as to the first issue that she didn't prearrange, they now say in their reply brief they've abandoned that issue. They recognize that it's a normalcy in 21st century travel that people plan in advance. People make arrangements especially when they're traveling with 14 others. This is what they say. The second premise, however, shows neither common sense nor does it track with the record. And I'll start with the record. The problem here, Justice Epstein, you were alluding to two statements that Ms. Lovitch made to her employers. And that is absolutely correct, but Concordia ignores throughout its brief essentially one of the critical statements. She said two things. When asked, and she was only asked by Mr. Canan. I have to emphasize this. How did this rental come about? I'm paraphrasing. But he didn't go into a whole line of questions that we know about prearrangement. When did you make these arrangements? How did you choose this? He simply asked her, how did you end up with a Hummer? And she said this at the same time. She said this to Mr. Canan. And this is on page C-104 where Mr. Canan fits as much. She said, I was looking into the price, the cost, and what car could accommodate our cargo. She said the same thing to Ms. Gephardt by Ms. Gephardt's reasoning on C-207 of the record. And she explained to the hearing referee on page C-243 that she said these two things. Now, if you're looking at cost and fold-down seats versus seats that have to be taken out and what car can accommodate whom, then it's blatantly obvious to anybody who's listening that you've comparison shopped the things. You've prearranged. So maybe the parties weren't trapping each other in this interrogation setting. I have some problem with what you're saying. With reference to what's on 243 and 244, it would be a lawyer's answer to an opponent for a witness who picks the hummer three months earlier. To then say it was the only vehicle available at the counter that could do the job. It would be an irrelevancy almost or a kind of a squirm to say that. Because the answer to that in ordinary vernacular and contextual communication is to say I thought that was the best vehicle to get. And that's what I picked instead of talking about what's available at the counter once the choice is made. But that's not what Ms. Lovitch said, Your Honor. And these are not my words. These are her words. I'll point you to page 243 of the record where the employer's attorney asks, what did you answer to them when they asked you that question about the hummer? Answer, it was the only vehicle available for the cost, the number of people and the cargo that we had. There were no follow-up questions by Mr. Burnett. What do you mean? I don't understand. Well, look at lines 25 and 26. Right. That's the second statement that she made. It was the only vehicle available at the airport. So there were these two ideas. That would be an irrelevancy almost because it would only be relevant if she would then say, well, I thought at the last minute that maybe I ought to go somewhere else or take another car. But it was the only one available. But the answer is either one or the other. The two together are not the kind of ordinary repartee or give-and-take communication that one would anticipate between people who are speaking without artifice. Well, this is not Ms. Lovitch's lawyer speaking. This is Ms. Lovitch speaking, her recollection about the interrogation. It is what it is, and credibility is not at stake in this issue. But I would say two other things. As Justice House pointed out, there's nothing in the record to suggest that this wasn't the only vehicle available when she arrived at the Sky Harbor Airport. We don't know one way or the other. But the word vehicle, words vehicle. It would be an irrelevancy if, in fact, the answer on her part was, that's the vehicle I chose three months earlier because it was most suitable. To then talk about what's available at the counter would at best be some surplus, almost a non sequitur. I disagree. I think that's almost too complicated of an interpretation. What would be the purpose of that bit of information? Well, there's context here. We have to remember that she reserved a vehicle in a class on December 15th. She researched this issue, and she figured out that this class, a special SUV, was the most suitable vehicle. Rental companies can't necessarily guarantee you a particular type of vehicle. You go to the counter. You've rented an intermediate. It's anything from Kia to a Ford. So this was the vehicle that was available. She reasonably may have interpreted Mr. Ganan's question about how did you end up with this particular vehicle. The only vehicle available in ordinary contextual meaning was the only vehicle that this particular distributor had, not that it was the only vehicle out there. And for that to be the response when, in fact, the response that you, I think, wish for us to take substantial notice of, is the response that it was the best vehicle and she actually selected it. But they knew or should have known from the other statement about price, cost, and cargo that she was comparison shopping. They willfully ignored that. They don't address it in their brief. In their reply brief, they omit that. They cut off the discussion on 243 and line 22. The part about cargo and cost does appear in their opening briefs. There's no discussion of it. The university is being willfully ignorant of this or Mr. Ganan was willfully dense. This is not a lie of omission. This is a conclusion of convenience for the university. And they say that the state hasn't come clean, that Ms. Lovitch, in their reply brief of four or five, that the state hasn't come clean about the fact that Ms. Lovitch essentially said that she had no choice at all. She never said that she essentially had no choice at all. She laid it out for Mr. Ganan and Mr. Gephardt that she was contemplating the choices in December. And this is the car that she ended up with. Now at this point, because they've acknowledged that people in 2011 rent cars in advance, but they haven't dealt with the two statements, now they're shifting to a new argument that comes and goes from brief to brief. Now they say in their reply brief that Mr. Ganan, on page six of the reply brief, he simply wanted to know why she ended up with this expensive, luxurious vehicle. That's a false premise. There's nothing in the record about expense or prestige. As counsel, in context, as far as I'm concerned, speaking for my colleagues, that's a straw man because the issue here, frankly, is whether she lied and what the consequences of the lie would be, given the fact that the referee and the board would find manifest weight of the evidence, that they would find support in the evidence to establish that this was a suitable purchase. So this isolates the issue to whether she was telling the truth or not. It absolutely is a straw man. I agree with you, Your Honor. They've raised it. So no one knows what the issue is with this vehicle. It's prestigious in some neighborhoods, maybe. It's not prestigious in other neighborhoods. They didn't like the expense. There is, in fact, contrary to what Concordia says, there's evidence on page C213 in Ms. Gephardt's testimony. She says that the university did not pay a dime for the vehicle rental. It all came from outside fundraising. So it's not the expense. What is it? We don't know. They don't like the image of this vehicle. What is your view as to the impact of a lie concerning a matter of business interest, albeit of no material consequence, to an employer? Well, it's not a lie. And do you have support for it? What is your position? I know what your position has got to be, just like when I was practicing law, I used to be able to dictate the briefs before I did the research because I knew where I had to get to. That's the difference between your job and ours. But what support is there for that? Well, there's no case law that I've found to support the idea that a lie, quote-unquote, established by the manifest way to the evidence, is per se a willful violation of the act. There are two cases that my opponent cites, and each of them has context. One of them involves an insubordinate employee in the Green Law case who told her boss to kiss my grits, and that was deemed to be a willful violation of the insubordination rule. We don't have that here. In the Medved case. But if someone's credibility is deemed by the employer to have been materially harmed by the fact that when you ask a direct question, you got an answer that was not truthful, which I know presumes that that's what occurred in this case, but if you take that premise, how many lies, and of what nature, would there have to be before an employer said, I can't believe what this person says anymore, and so I'm not going to continue to employ this person? Well, there probably doesn't have to be too many lies. Sometimes an employer doesn't have to have a relationship with an employee that's based on trust, but going back to the legal standard, there has to be, they must satisfy the claimant, the employer who's denying benefits must satisfy two elements. One is the willful violation of a known rule, common sense, people know they shouldn't lie. There's no evidence here, there's no argument here that it was willful. There are different interpretations. There are two things that Ms. Blavich said that Concordia has not really synthesized, that Mr. Gnan and Ms. Gephardt didn't synthesize on the spot, didn't follow up with further investigation, didn't question. This was their best reason, they say, among seven others that they had to terminate her. And the second prong of that is harm. And they haven't shown that they would be in any way harmed by either a lie about how the rental came about or a misunderstanding. But wouldn't it be a harm to have to continue to employ someone who you believe lied to you? Wouldn't that be a harm? Yes, it would be in the potential of that action. It would be harm in theory. But that's the situation. Well, I mean, you have somebody who by definition in this record was entrusted with the care and supervision of 14 students and who was given the right by the university or the privilege of the university to book trips, incur expenses, et cetera, et cetera. And if you felt that this person had deliberately lied to you, it's not much of a reach to say that that would be the continued employment of that person in that position would be a harm. That is true. But, again, I've yet to see a case that equates lying with per se misconduct. Wouldn't that depend on the job of the person in issue, at least in certain degrees? It would depend on the employer showing that both of these elements are satisfied. And they haven't. They forfeited this argument. Well, it would certainly by definition virtually be an insubordination because as well as. Well, it's an insubordination because implicit in the question is tell me the truth. And if you lie, you're insubordinate. But there has to be, again, there has to be actual harm. In the MedVet case, the employee lied not about an expense per se or a car rental, certainly. The employer said that she was sick. She was actually working a second job. That harms the bottom line of the employer to have somebody using a sick day and not doing their job. No, that's not. That's a misreading, I think, of MedVet to the extent that that's an independent wrong. To work a second job when you're committed to the first is a substantive wrong. To lie about it is something independent of it. That may be my read. That's one of the fallacies, perhaps, if there are any, of the state's position, is the infiltration of the degree of substantive harm as a modification of the truthfulness of the communication. Fair enough. My read of MedVet is that that was the harm to the employer. But be that as it may, the university, not the board, has the burden of showing both a willful violation and the harm. Mr. Siegel, can I, without, if there are any objections by my colleagues, ask you about the fundamental fairness, and we have the abuse discretion standard here, of saying to a party who has been met, arguably, by hearsay, objections preventing them from bringing in certain facts, and I'll say, okay, well, here are the witnesses. The witnesses are known to everyone. We'd like to present them and being told, no, sorry. We're going to decide the case without hearing these witnesses. Yes, let me address the second argument. A couple of practical points on this. This hearing is an anomaly. It went on for five and a half hours, ten times what it was scheduled to be. Well, who does the scheduling? The board. Is that in the record? Yes, it is. The board tells all the parties in the advisory to expect a half an hour hearing. That is at C49. Parties are also told in that advisory to contact the hearing referee immediately upon the schedule of the hearing, saying, hey, C49, and on C46, give a 24-hour advance notice so that parties aren't sandbagged by him showing up. Parties have, and pro se parties, have the opportunity to prepare for the witness, for the hearing as they see fit. These hearing referees are extremely busy, I needn't tell you, given the current economic situation. They hear eight of these a day. That's the normal workload. They're scheduled back to back to back. My opposing counsel makes it sound like the hearing referee had a lunch appointment or something personal. She was run after two hours on the first day of hearing. She is running into the next hearing. That's why it was continued. But the reality is, and they're so busy, by the way. They're now having hearings on Saturdays. The reality is that only if we can take judicial notice of that. I'm throwing that question out so we can comment back. I believe you can because the dockets of courts and administrative agencies. I knew that about immigration judges. They're busy. And this had to be continued. They're never continued. This is one in 1,000 cases. Well, I know we're way off the record. I mean, your testimony that this was one of 1,000 cases and that they're never continued, I don't see anything in that record about that. So why don't we reel you in. I withdraw that, if I may. The point is that Concordia was fortunate that the hearing referee even went to a second day. Otherwise, they would have been stuck at the end of day one with the three witnesses that they chose. And they chose three university administrators who had no firsthand knowledge of the events in Arizona. They also, despite the fact that the advisory that I've cited to you counsels, pro se parties, and lawyers to bring in witnesses who have firsthand knowledge. They also chose to attack eight different issues in 30 minutes, even though they had that 30-minute limit. They didn't have to do those things. They were in charge of their own strategy. They had every opportunity to present a full case. And the due process requirements don't dictate that the opportunity be... It dictates that the opportunity be there, not that it be achieved. So... Well, there's some strong dictum in the Abramson case and in the Satza's case about being able to get a complete case, complete examination, cross-examination, and get all the evidence. But it doesn't go on ad infinitum. And the hearing officer's decision is premised on the idea that she says at C-243, if you have important witnesses to talk about the futon or the 21-year-old wandering around unattended at Midway Airport or how the investigation was conducted, they should have been lined up on day one. And that's, in fact, what the regulation that we cite requires. You're supposed to be ready when you appear with the witnesses and documents that you want to present. You appear at the beginning of the hearing. And the rules envision a half-an-hour hearing. And you disclose your witnesses 24 hours in advance. And you can always utilize subpoenas to secure the witnesses you want. They did not avail themselves of subpoenas for these students who were not university employees. And for Concordia to say there was no rule on any of this, that the hearing referee was making it up as she went along, is to ignore the administrative regulation, the advisory, and ignores the fact that the record shows that they did disclose three witnesses the day before the first hearing at C-86, and then one more, they say, on the second day. One more, not seven more, at C-50. In fact, it was two more. It was a student and her parent. So unless the court has other questions, we'll just conclude by saying that the hearing referee aptly summarized this case when she found that this was a hunt without merit. And the hearing referee also didn't abuse her discretion when she, in essence, held that this was an ill-planned hunt and that the university did not take the steps it was required to take to put on the case that it thought it needed to advocate. We ask that you move. Thank you. Thank you, Mr. Siegel. Mr. Kelly, any final words? I just want to address a couple of the points that were made. On the issue of this hearing, and normally they're 30 minutes and so forth. Some of these are all arguments. I'll be very brief. The problem here is we have eight reasons behind the decision. And if the board is going to require, which it has a right to do, that we present non-hearsay evidence behind it, it has to take more than 30 minutes. It's impossible to put in our case and, of course, you've got the ---- Well, but that really isn't an issue, is it? Because it was far more than 30 minutes, and the question was does the fact that it had to be and was more than 30 minutes give unbridled license to extend it as long as you would prefer? No, Your Honor. And that's, you know, again, we're not asking to put in cumulative evidence. We're simply asking to cure the very issue that was raised, which is the hearsay issue. How many witnesses were you denied again? Four. Going back to there was an issue about, and I believe there was a question earlier about the fundraising dollars. And there was a quote by Mr. Siegel to page 213 of the record. That page actually goes on to state that the fundraising dollars go into the general fund of the university. In other words, if the fundraising exceeds the expense. Was it your assertion that there was no anticipation that this would go into a second day? I can't say there's anything in the record. No, no, no. But in the comment we wrote, I thought you mentioned the fact that this was the referee herself who had to put this hearing over for another day. Correct me. Is it the implication that you anticipated it would all be done on the same day? To be honest, Your Honor, I wasn't. I understand. But if that's the implication, where are the other four witnesses on that first? Well, again, Your Honor, all I can say to that is, obviously it was fortuitous for us that the hearing was continued. We were simply trying to put the testimony into the hearsay objections of the Claimants Council. And, again, that took time. But basically, Justice Gordon's point is, you're given these regulations. You're given this notice. It's basically, to be paraphrased and maybe just restated, it would be whatever you have, bring. And anticipate a short hearing to put these witnesses on and bring the people with firsthand knowledge. Your side didn't. Was surprised by a ruling from the referee. And given latitude. And when given latitude and having the hearing extended for another day, brought undisclosed witnesses. And at some point we're told, that's it. We're going to give you two more. Call who you want. But that's it. And it's not exactly similar to having a trial in a court of law in that regard. And there is a difference, though. There's no witness list in this proceeding. If it was required that we present a list before the hearing of everyone who's going to testify. But that may be begging the question. Because I think your opponent would say that the requirement in the recs, that you bring them with you when you appear at the hearing, is the equivalent of a witness list. Only it's done closer to the hearing time. And what you call fortuity, if the hearing officer said, you know, I'm just going to push off everything else on my schedule, let's go. You still don't have those witnesses. They're not there. Because they're not there. Because your side, not you, your side anticipated that the people they brought were sufficient. Well, again, I can't speak to the anticipation. No, but presumably they brought the people because they didn't subpoena anybody. They didn't say we subpoenaed somebody and they didn't show up. When they came, they came with what they wanted to bring, presumably. Well, again, it was the idea that day two was going to correct or overcome these objections. But that would imply that you had any anticipation of a day two. Which, given the range of experience, and I don't know if you want us to take judicial notice of that, the range of experience that good lawyers have would speak to the recognition that one day was about all you could anticipate. Well, again, I can't speak to what should or shouldn't have happened here. Of course, it's not only our case that's presented. There's a case presented by the plaintiff that takes time. And, you know, there's 5.5 hours, as counsel mentioned, but that's not all just our presentation. That's a presentation of the other side as well. And part of this is in essence rebuttal. I mean, you know, at trial you get an opportunity at times to bring on rebuttal witnesses. And in essence, that's what we were doing here. I just want to make one final point, if I may. The issue was brought up on the lie regarding the Hummer about Ms. Lovich explaining that, well, this was just the best vehicle for the cost and the need, et cetera. I submit to you that that's just another example of Ms. Lovich's dissembling here, that she makes a statement to Mr. Ganan, quote, when she got to the counter that was the only available vehicle that they had left at the counter. Anything about this is the best fit for the cost and for the number of people, et cetera, is a contradiction of that because he was asking her for the reason why she rented that vehicle. And she told him something, excuse me, that was untruthful. Gentlemen, thank you both for a very well-argued presentation and for fine briefs. We'll take the matter under advisement.